**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**TRUE THE VOTE, DONNA KNEZEVICH, JOSEPH
KNEZEVICH, ELAINE VECHORIK, ROY NICHOLSON,
JANE COLN, DORIS LEE, MARK PATRICK, JULIE
PATRICK, PAUL PATRICK, SYBIL TRIBBLE, CHAD
HIGDON, JENNIFER HIGDON and DAVID PHILLEY**         **PLAINTIFFS**

**V.**         **NO. 3:14CV144-M-S**

**THE HONORABLE DELBERT HOSEMAN, in his
Official capacity as Secretary of State for the
State of Mississippi and The REPUBLICAN PARTY OF
MISSISSIPPI**         **DEFENDANTS**

---

**ORDER**

This cause comes before the court on its own motion, directing the parties to show cause as to why this case should not be transferred to the Southern District of Mississippi, pursuant to 28 U.S.C. § 1404(a). That statute provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Based upon the allegations of the complaint, it is not clear to this court why this case was filed in the Northern District of Mississippi. Although the complaint does not so indicate, both defendants in this case are residents of Hinds County, and it would appear that the overwhelming majority of the witnesses and evidence in this case are located in the Jackson area. Indeed, defendants' residence aside, plaintiff True the Vote alleges that, immediately prior to the election, it sought but was denied records by "Hinds and Rankin Counties." It thus seems clear

1

that, factually speaking, this case is very strongly centered in the Jackson Division of the Southern District of Mississippi.

It appears that the complaint has been drafted largely to give the impression that it involves Northern District issues when, particularly in light of recent Fifth Circuit precedent discussed below, it actually does not. While a number of plaintiffs in this case do reside in the Northern District, it appears that many, if not most, of them allege nothing more than that they "voted in the 2014 Republican Primary Election and Republican Primary Run-off Election." The same could be said for hundreds of thousands of voters across this state. It is well settled that, to meet the constitutional standing requirement, a plaintiff must allege "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

It is far from clear that the plaintiffs asserting vote dilution claims suffered a "personal injury" from any instances of double voting which may have occurred in the Republican primary elections, and they allege no facts plausibly suggesting that any such voter fraud was "fairly traceable to the . . . allegedly unlawful conduct" of either of the two defendants in this case.[1] Moreover, the actual relief sought in the complaint relates solely to the release of unredacted voter records, which appears to constitute redress for plaintiffs' National Voter Registration Act claims, rather than for any vote dilution claims.

In light of the foregoing, it appears that the plaintiffs who allege nothing more than having had their votes diluted lack standing to sue and that they may have been added to this case solely to give it a deceptively "northern district" appearance. The court's concerns in this

---

[1]As to the State of Mississippi, the plaintiffs seek only prospective injunctive and declaratory relief (along with attorneys' fees), presumably in recognition of the State's Eleventh Amendment immunity. *See Ex Parte Young*, 209 U.S. 123 (1908). In order to obtain such prospective relief, however, plaintiffs may not rely upon alleged violations by non-parties to this lawsuit, such as county officials.

2

regard are heightened by the fact that the drafter of the complaint frequently seems unaware of the precise nature of the allegations of particular plaintiffs, at times making vague allegations "upon information and belief." It is unclear to this court why a drafter would find it necessary to state matters "upon information and belief" which should be within the personal knowledge of the plaintiffs. Even assuming that some of the northern district plaintiffs sought records from counties in this district (as the complaint appears to vaguely suggest), the fact remains that those counties are not defendants in this lawsuit.

That brings the court to the fact that, standing issues aside, plaintiffs' vote dilution claim fails to assert a coherent theory of liability against either of the two defendants in this case.[2] The vote dilution claim is ostensibly based upon the Equal Protection Clause, but the complaint wholly fails to allege facts detailing what role either defendant had in bringing about any double voting which may have occurred in the Republican and Democratic primary elections. The complaint describes, in vague and conclusory terms, how certain plaintiffs "perceived," from their review of poll books, that certain individuals may have voted in both the Democratic and Republican primary elections. Even assuming that the plaintiffs' perceptions in this regard are accurate, however, the fact remains that defendants cannot be held liable for acts of double voting by private individuals which it did not cause to occur. Persuasive authority from a different circuit raises additional doubts in this regard.

In *Osburn v. Cox*, 369 F.3d 1283, 1285-86 (11th Cir. 2004), the Eleventh Circuit rejected constitutional challenges by African-American voters who claimed that "the Georgia and DeKalb County Republican party members conceived a plan to run a candidate in the

---

[2]The Fourteenth Amendment is generally inapplicable to a private entity such as the Mississippi Republican Party, but this court is cognizant of the fact that political primaries have been held to constitute "state action." *See Smith v. Allwright*, 321 U.S. 649, 663–64, 64 S.Ct. 757, 764–65, 88 L.Ed. 987 (1944) (political primaries that are an integral part of the machinery for choosing state officials constitute state action).

3

Democratic Primary, funded that candidate, and then encouraged Republican voters to crossover and vote for that candidate." The plaintiffs in *Osburn* alleged that the crossover voting of the Republicans diluted the voting strength of African–American voters and resulted in the defeat of their preferred candidate. *Osburn*, 369 F.3d at 1286. The Eleventh Circuit in *Osburn* upheld the dismissal of plaintiffs' claims, writing that "the case law weighs against an individual's right to assert such a claim and is buttressed by the fact that the relief that plaintiffs seek, i.e., to limit the voters who could participate in a Democratic primary to those who plaintiffs consider to be 'Democratic voters,' would likely be held unconstitutional if challenged by the state political party." *Osburn*, 369 F.3d at 1287. The Court accordingly rejected the plaintiffs' claims on both standing and substantive grounds.

*Osburn* makes it clear that the phenomenon of "cross-over" voting by members of an opposing party is one which does not inherently involve any violation of the U.S. Constitution, and, indeed, many of the potential remedies for this practice run the risk of violating the Constitution in their own right. It can certainly be argued that, from the perspective of federal law, nothing particularly untoward occurred in Mississippi's 2014 Republican primary run-off election, even assuming that plaintiffs' allegations of cross-over voting are correct. Plaintiffs contend that such voting violated Miss. Code Ann. § 23-15-575, which states: "No person shall be eligible to participate in any primary election unless he intends to support the nominations made in which he participates." From the perspective of federal law, however, any such Democratic voters were, arguably, simply U.S. citizens and registered voters expressing their opinions in an election. Regardless of whether one agrees with this argument, there is very serious doubt as to whether any of the Northern District plaintiffs alleging vote dilution claims have any realistic possibility of obtaining any relief in this case, and it appears that they may

4

have been added simply to assist in the manufacture of an argument that venue properly lies in this district.

It seems clear to this court that what plaintiffs are actually alleging in this case is that Mississippi's enactment of Miss. Code Ann. § 25-61-5, discussed below, hinders their federal right, under the National Voter Registration Act (NVRA), 42 U.S.C. §§ 1973gg *et seq* to gain access to voting records, and thereby *prove* that violations of state law took place. The court finds this claim, unlike the Equal Protection vote dilution claim, to be a coherent one which might at least conceivably prove successful,[3] although a number of obstacles do appear to stand in plaintiffs' way. The NVRA does appear to strongly support the right of citizens to gain access to certain voter records, providing that:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

42 U.S.C. §1973gg-6(i).

In arguing that Mississippi law frustrates the workings of this federal statute, plaintiffs assert in their complaint that:

> Mississippi law imposes additional restrictions on public access to records concerning the accuracy and currency of voter registration rolls, such that only certain aspects of the voter rolls are permitted to be copied and inspected by the public. In particular, Mississippi law requires parties inspecting records under the NVRA to bear the cost of redacting "exempted," identifying information from the voter rolls. See MISS. CODE. ANN. § 25-61-5 ("public agency shall be entitled to charge a reasonable fee for the redaction of any exempted material, not to exceed the agency's actual cost."). While these

---

[3]It is not clear to this court why this argument needs to be raised in federal court, since state courts are equally capable of applying federal preemption law. Moreover, the court's understanding is that an election challenge is likely to be filed in state court, and federal courts have traditionally been hesitant to intervene in matters which are being litigated in state proceedings. *See Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971), *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). It can certainly be argued that, since any state court considering an election challenge will be dealing with the very same election materials as are at issue in this case, any relief would be better sought with that court.

>  costs appear minimal at first blush, upon information and belief, parties inspecting voter rolls have had to pay as much at $1,400 to redact dates of birth from the voter records. Such information while "exempted" by Mississippi law from disclosure is not exempt from disclosure under the NVRA. Nor may the State force parties to bear the costs of redacting such information form voter rolls, as the NVRA does not allow for states to recover reasonable costs of redaction.

The court does not find plaintiffs' argument in this regard to be illogical, but a recent Fifth Circuit decision may prove a significant obstacle to their NVRA claims.

In *Voting for America, Inc. v. Steen*, 732 F.3d 382, 399 (5th Cir. 2013), the Fifth Circuit, in a 2-1 split panel decision, found that the NVRA did not apply to voting records until they were actually in the custody of the state, rather than in the hands of lower-level election officials. 732 F.3d 382 (5th Cir. 2013). In so concluding, Judge Edith Jones wrote for the panel majority that:

> However, Appellees disregard a crucial distinction: the NVRA only pertains to records "maintain[ed]" by the State, while the Photocopying Provision only applies to voter registration applications in the hands of VDRs, before they are officially received or maintained by the State. For this reason, the district court misplaced reliance on *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012), a case that specifically addressed the denial of access to voter registration applications in the government's long-term possession, rather than those in the hands of VDRs. The question here is not whether such applications will be made available for photocopying but how. Thus, we disagree with the district court's reasoning that the applications received and delivered by VDRs are within the "constructive possession" of the state.

*Steen*, 732 F.3d at 399. *Steen* appears to be adverse authority for the plaintiffs in this case, since the complaint seeks relief as to records still in the custody of Mississippi counties, and not in the custody of the State itself. Moreover, the Fifth Circuit in *Steen* distinguished the Fourth Circuit's decision in *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) on the basis of this fact, and the plaintiffs in this case rely strongly upon *Long*.[4]

---

[4] It appears to this court that *Long* implicated the federal interests which motivated the enactment of the NVRA to a far greater extent than this one does. That is, the plaintiffs in *Long* sought, and were outright denied, voter registration records which they needed to investigate concerns that citizens had improperly been prevented from voting in an election. *Long*, 682 F.3d at 333. This case, by contrast, involves alleged "double voting" resulting not from irregularities in the voter registration process, but from citizens choosing to vote in both the Democratic primary and the Republican primary run-off elections, in violation of a Mississippi state statute. Unlike in *Long*,

Plaintiffs might at least argue that the *intent* of the NVRA was to permit citizens easy access to records relating to the "accuracy and currency of official lists of eligible voters," even (or so one could argue) poll books in the hands of counties. Still, the actual statutory language makes reference only to states, not counties, and the Fifth Circuit in *Steen* appears to have taken that language at face value. It may be that the only way plaintiffs can prevail in this lawsuit is by convincing the *en banc* Fifth Circuit to take up the question of whether §1973gg-6(i)'s directive for "states" to maintain access to voting records applies, by implication, to records which are still in the possession of counties, municipalities, or other similar entities. On the other hand, plaintiffs may be able to persuade a district court that *Steen* is distinguishable even without the necessity of a reconsideration of the decision by the *en banc* Fifth Circuit. The court makes no findings in this regard.

This court does note that there is considerable doubt as to whether plaintiffs will have time to seek *en banc* Fifth Circuit review before the issues in this case become completely moot. Indeed, it appears that the issues in this case may already be well on their way to becoming moot, partly due to plaintiffs' own failure to act more expeditiously. Plaintiffs did not seek a TRO or other emergency relief, and this court has had no contact from plaintiffs' counsel requesting any sort of emergency hearing (as is typically the case when parties seek expedited relief). The court's understanding is that that many of the poll books in question either have been or are in the process of being sent to the State of Mississippi, which would seem to make any relief as to the counties moot, in addition to being barred by *Steen*. Plaintiffs do seek permanent injunctive relief (applicable even to future election controversies), but there is considerable doubt as to whether any of them have standing to seek such relief, given the requirement that they

---

there is no allegation that any citizen was prevented from voting, and the NVRA seems to be raised largely as a means to an end, namely of proving that a violation of Mississippi election laws took place.

demonstrate a likelihood that they will suffer future injury. *See Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). It appears to this court that the plaintiffs in this case find themselves at one end of a controversy with little, if any, precedent in Mississippi political history, and it seems unlikely that they will find themselves in a similar situation in the future.

As to the question of venue, it appears to the court that these considerations, as well as *Steen*, make an already strong case for § 1404(a) transfer overwhelming, since they seem to confirm that any NVRA relief which plaintiffs might be able to obtain in this case would be in Jackson. It has not escaped this court's attention that the issues in this case are highly charged, politically speaking, and it appears that the decision to file suit in Oxford may have been based upon political calculations, the exact nature of which are unclear to this court. Regardless, the § 1404(a) inquiry is based upon non-political factors which simply seek to ascertain which court is best positioned to decide a particular case. The court is accordingly strongly inclined to transfer this case to the Southern District of Mississippi, but it will give the parties an opportunity to persuade it otherwise prior to doing so.

It is therefore ordered that the parties are directed to show cause as to why this case should not be transferred to the Southern District of Mississippi. Response shall be filed by July 18, 2014.

This the 7th day of July, 2014.

                                                 **/s/ MICHAEL P. MILLS**
                                                 **UNITED STATES DISTRICT JUDGE**
                                                 **NORTHERN DISTRICT OF MISSISSIPPI**